# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF _____ ILLINOIS, EASTERN DIVISION _____

| | |
|---|---|
| UNITED STATES OF AMERICA | **MAGISTRATE JUDGE VALDEZ** |
| v. | **CRIMINAL COMPLAINT** |
| MARIA AVILA, RAFAEL QUIJADA-QUIJADA, RAMON IGNACIO ACEDO, and JOSE EDUARDO CISNEROS-RUBIO | **CASE NUMBER:** |

# 08CR 0140

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about February 15, 2008, in Cook county, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants did,

conspire with each other, and others known and unknown, to knowingly possess with intent to distribute and to distribute a controlled substance, namely, in excess of 5 kilograms of mixtures and substances containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1),

in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

I further state that I am a Special Agent of the U.S. Drug Enforcement Administration and that this complaint is based on the following facts:

PLEASE SEE ATTACHED.

**FILED**

**FEB 2 7 2008**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**RECEIVED**

FEB 1 6 2008

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

Continued on the attached sheet and made a part hereof.    ☐ Yes    ☐ No

_____
Signature of Complainant

GOVERNMENT
EXHIBIT
PRELIM 1

Sworn to before me and subscribed in my presence,

February 16, 2007 _____    at    Chicago, Illinois
Date                                                          City and State

_____
Maria Valdez, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS    )
                     )
COUNTY OF COOK     )

## AFFIDAVIT

I, Lamont Johnson, being duly sworn, depose and state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration (DEA). I have been employed as a Special Agent since August 2004. I am responsible for investigating violations of the Controlled Substances Act, Title 21 of the United States Code. I am currently assigned to a HIDTA (High Intensity Drug Trafficking Area) investigative group within the Chicago Field Division Office.

2.      I have received specialized training in the enforcement of state and federal narcotics laws, and I have been involved in all aspects of narcotics trafficking investigations, including: acting as an undercover officer; debriefing of defendants, witnesses, and informants; conducting surveillance; and analyzing documentary and physical evidence.

3.      The information in this affidavit is drawn from interviews of a confidential source; consensual recordings; physical surveillance; information received from other law enforcement agents and government agencies; my experience and training; and the experience of other agents. Statements included in this affidavit are set forth in substance and in part, and are not verbatim.

4.      This affidavit does not contain all facts known to me about this investigation.

5.      During this investigation agents have received information from a confidential source (CS). The CS is a paid DEA source, who has assisted and provided reliable information to the DEA since approximately 1998. Information provided by the CS has led to prior drug convictions and seizures.

1

6.    Based on my training and experience, I know that those involved in the distribution of drugs frequently use code words instead of the true names of controlled substances.

7.    By at least in or around October 2006, agents of the DEA, with the assistance of the CS, have been investigating Individual A's unlawful distribution of controlled substances. Since in or around October 2006, the CS has engaged in telephone conversations with Individual A in which Individual A attempted to arrange for the CS to purchase cocaine from Individual A's drug sources. During this investigation, the CS and an undercover DEA Task Force Officer (UC) have engaged in meetings with individuals working with Individual A to arrange a cocaine purchase, including MARIA AVILA.

8.    On or about February 4, 2008, the CS informed DEA agents that Individual A had contacted the CS several times via cellular phone and text messaging. The CS also informed agents that Individual A asked the CS if the CS was "ready to do business" soon. The CS stated that the he/she told Individual A to make sure he was ready because the last time they attempted to conduct a transaction, Individual A was not ready.

9.    During this conversation, according to the CS, Individual A told the CS that he was flying to Sonora, Mexico, and would contact the CS when he arrived in Sonora. The CS informed agents that he/she communicated with Individual A by cellular telephone and text messaging after Individual A arrived in Sonora. During these communications, according to the CS, the CS asked Individual A whether he would be sending a "truck" up. Individual A replied that he would be sending one up soon.

10.    On or about February 5, 2008, the UC placed a recorded call to Individual A at telephone number. Prior to this call, the UC had engaged in many prior conversations with

2

Individual A in which Individual A and the UC had attempted to arrange drug transactions. During this conversation, Individual A informed the UC that "it" should be arriving soon, and that "it" would probably be 10.

11.    During the February 5, 2008 conversation, Individual A informed the UC that, after this deal, the UC would be able to order whatever he wanted. Individual A also informed the UC that Individual A was going to stay with the owners of the cocaine in Mexico as a guarantee, and that Individual A would be sending his wife to oversee the transaction.

12.    On or about February 13, 2008, Individual A and the UC engaged in several recorded telephone calls. During these calls, Individual A informed the UC that "everything was there." Individual A also informed the UC that Individual A's wife would be arriving in Chicago later that night. Individual A informed the UC that the UC would be happy because "lots of kids were coming." Also during these calls, Individual A informed the UC that Individual A's wife would be arriving on February 14, 2008, instead of February 13, 2008.

13.    On or about February 14, 2008, Individual A contacted the UC via telephone and informed the UC that part of the "load" belonged to Individual A, and that Individual A was talking to the other owners of the "load" to see if the CS could view the "load" before the transaction. This telephone call was recorded.

14.    Also on or about February 14, 2008, Individual A contacted the UC by telephone and instructed the UC to provide Individual A's people with one million dollars, and that Individual A would get the remainder of the money from the UC at a later date. During this conversation, the Individual A requested that the UC provide Individual A's wife with some money to help her return home. This telephone call was recorded.

3

15.    On or about February 15, 2008, at approximately 8:39 a.m., a woman, who as described below was identified as MARIA AVILA, contacted the UC by telephone. AVILA informed the UC that the "girl" would be 9 ½ instead of 50. The UC then advised AVILA that he thought it would be 50, and AVILA informed the UC that she thought it would be 50 as well. AVILA then informed the UC that she would call him back and give the UC another telephone number. The UC then asked AVILA if they could do more after this and Maria AVILA stated "yes of course." This telephone conversation was recorded.

16.    On or about February 15, 2008, at approximately 8:52 a.m., the UC received a second telephone call from AVILA. During this call, AVILA provided the UC with the cellular telephone number of another individual, who as described below was identified as RAFAEL QUIJADA-QUIJADA. AVILA advised the UC to contact QUIJADA for further instructions.

17.    Following the call described in paragraph 16 above, the UC placed a recorded telephone call to QUIJADA. During this conversation, QUIJADA informed the UC that he was at a Best Western Hotel in downtown Chicago, but he did not know the exact location. QUIJADA informed the UC that he would call the UC back with the location. After waiting a few minutes, the UC placed several telephone calls to QUIJDA and received no answer.

18.    At approximately 10:29 a.m., on or about February 15, 2008, the UC placed a recorded call to AVILA and advised her that the UC could not get in contact with QUIJADA. AVILA informed the UC that she would attempt to contact QUIJADA. At approximately 10:47a.m., the UC placed a recorded telephone call to QUIJADA. QUIJADA apologized for not answering the phone earlier, and informed the UC that another person would be getting in contact with the UC.

19.    Also on or about February 15, 2008, at approximately 10:49 a.m., the UC received a telephone call from an individual later identified as RAMON IGNACIO ACEDO. ACEDO informed the UC that he was at the Best Western Hotel located on South Michigan Avenue at 11th Street in Chicago. The UC then advised ACEDO that the CS would be coming to pick him up.

20.    On or about February 15, 2008, at approximately 11:15 a.m., the CS arrived on the north side of the above-described Best Western. (Prior to the CS's arrival, agents had searched the CS's vehicle and the CS for contraband and weapons. No contraband or weapons were discovered. Agents then followed the CS to the meeting location.) At approximately 11:16 a.m., agents observed ACEDO exit the north entrance of the hotel carrying a black suitcase. Agents then observed ACEDO place the suitcase in the trunk of the CS's vehicle and sit in the front passenger seat. At approximately 11:21 p.m., agents observed ACEDO and the CS exit the CS's vehicle and walk to the trunk of the CS vehicle. At that time, agents observed the CS open the trunk and observed as both the CS and ACEDO leaned over to look into the trunk. Shortly thereafter, agents observed the CS close the trunk, and ACEDO and the CS got back into the vehicle. Shortly thereafter, the CS informed agents by telephone that he had observed the cocaine.

21.    After the CS informed agents that he had observed the cocaine, agents followed the CS's vehicle, which was still occupied by the CS and ACEDO, to a restaurant parking lot. Agents then observed ACEDO and the CS enter the restaurant.

22.    On or about February 15, 2008, at approximately 11:57 a.m., the UC informed QUIJADA in a recorded telephone call that the UC wanted to meet with QUIJADA at the Best Western Hotel so that the UC could pay QUIJADA for the cocaine. At approximately 12:10 p.m., agents observed QUIJADA enter the passenger side of the UC vehicle, which was outside of the Best

5

Western Hotel. During this meeting, the UC informed QUIJADA that he had $190,000 for the cocaine. The UC asked QUIJADA, among other things, why "9 ½" and QUIJADA informed the UC that that was all that would fit. The UC then informed QUIJADA if everything went well, they could they do more transactions together. QUIJADA informed the UC that he would need a few days, but after that, they could do whatever the UC wanted to do.

23.     On or about February 15, 2008, at approximately 12:12 p.m., agents arrested QUIJADA and ACEDO. Agents also seized a black suitcase from the trunk of the CS's vehicle. The suitcase contained 10 block-shaped packages, one of which was smaller than the other 9. The packages were wrapped in duct tape. The contents of one of the packages was field-tested and tested positive for cocaine. Based on my training and experience, and the size and weight of the packages, I believe the weight of these 10 packages to be over 5 kilograms.

24.     On or about February 15, 2008, at approximately 12:29 p.m., the UC placed a recorded phone call to AVILA and informed her that he wanted to pay her for a portion of the cocaine that was delivered to the CS. AVILA agreed to meet with the UC at the Best Western Hotel. Shortly thereafter, agents arrested AVILA at the Best Western Hotel. Agents recognized AVILA by, among other things, the fact that the UC and the CS had met with her on prior occasions while attempting to arrange cocaine transactions during this investigation.

25.     Following ACEDO's arrest, ACEDO signed a written waiver of his *Miranda* rights after being advised of such rights. During a subsequent interview, ACEDO admitted to agents that he had knowingly delivered the cocaine to the CS on February 15, 2008. ACEDO also informed agents that the cocaine had been transported from Arizona to Chicago by JOSE EDUARDO CISNEROS-RUBIO in a Dodge truck containing a hidden compartment. ACEDO assisted agents

6

with locating CISNEROS-RUBIO at the Best Western. CISNEROS-RUBIO was then taken into custody.

26.    After CISNEROS-RUBIO's arrest, he was advised of and waived his *Miranda* rights. (This advisement was in Spanish.)   During the subsequent interview, CISNEROS-RUBIO stated that he was put into touch with ACEDO by a friend who said that ACEDO was looking for someone to drive a vehicle to the United States for $1,000.   On February 11, 2008, CISNEROS-RUBIO met with ACEDO in Nogales, Mexico.   CISNEROS-RUBIO stated that he met with ACEDO at approximately 9:30 p.m., and that ACEDO asked CISNEROS-RUBIO if he had a valid driver's license and insurance to drive in the United States. CISNEROS-RUBIO told ACEDO that he had a valid driver's license, but no insurance. CISNEROS-RUBIO stated that ACEDO gave him $100 and a registration for a Dodge truck. ACEDO then told CISNEROS-RUBIO to buy U.S. insurance for the truck, which he did.

27.    CISNEROS-RUBIO stated that he and ACEDO then crossed the United States border on foot and met with QUIJADA who was driving a Cadillac.  The three then drove to Tucson, Arizona. Once in Tucson, QUIJADA and ACEDO dropped CISNEROS-RUBIO off at a gas station, and was told by QUIJADA and ACEDO that they would be back soon.  Approximately 10 minutes later, ACEDO and QUIJADA returned with a Dodge truck and told him that he would be driving it to Chicago. CISNEROS-RUBIO stated that ACEDO provided him with a cellular telephone and QUIJADA gave him $1,000 for gas and expenses. CISNEROS-RUBIO stated that ACEDO told him to contact ACEDO when he was close to Chicago.

28.    CISNEROS-RUBIO stated that after ACEDO and QUIJADA left, he examined the truck to make sure that there were no hidden compartments in the truck. CISNEROS-RUBIO stated

7

that he did not see anything that was modified in the truck. CISNEROS-RUBIO stated that he drove to Chicago for 30 hours with out any rest. CISNEROS-RUBIO stated that he was stopped in Oklahoma by a Trooper for speeding and was given a warning ticket.

29.    CISNEROS-RUBIO stated that he arrived in the Chicagoland area around 6:00 a.m. on Wednesday, February 13, 2008, and that he checked into a motel and went to sleep. CISNEROS-RUBIO stated that at approximately 1:00 p.m., he received a call from ACEDO who told him to drive to downtown Chicago, and to park the truck inside the Best Western Hotel's parking lot. CISNEROS-RUBIO stated that he arrived at the Best Western and drove around the hotel multiple times but could not locate the parking lot.

30.    CISNEROS-RUBIO stated that he called ACEDO and told him that he was driving around the Best Western Hotel, but could not locate the parking lot. CISNEROS-RUBIO stated that he was instructed by ACEDO to park in front of the hotel and wait for him. CISNEROS-RUBIO stated that minutes later he observed ACEDO walk out with a suitcase from the hotel. CISNEROS-RUBIO stated that ACEDO told him that he would park the truck and told CISNEROS-RUBIO to wait for him in the lobby of the hotel. Approximately 10 minutes later, ACEDO returned with the suitcase to the hotel, and told CISNEROS-RUBIO to get a hotel room. CISNEROS-RUBIO stated that at approximately 10:00 p.m., ACEDO came to his room and told him that he was going to have to wait until the next day to get paid.

31.    CISNEROS-RUBIO stated that on the following day he checked out of the hotel at approximately at 12:30 p.m., and left his bags in the lobby and went for a walk. Minutes later he was called by ACEDO, who told him to come back to the hotel.

8

32.     After returning to the hotel, CISNEROS-RUBIO stated that ACEDO and QUIJADA were waiting for him in the lobby, and told him that he would have to wait another day to get paid because they have not been paid yet. CISNEROS-RUBIO stated that he became very upset and told them that he wanted to return to Mexico.

33.     CISNEROS-RUBIO stated that at approximately 9:00 p.m., on February 14, 2008, ACEDO came to his room and took CISNEROS-RUBIO's blue bag. ACEDO told him that he needed the bag for the clothes that they had purchased. ACEDO told him that he would be able to leave early in the morning. CISNEROS-RUBIO stated that on February 15, 2008, at approximately 7:00 a.m., ACEDO came to CISNEROS-RUBIO's room, took CISNEROS-RUBIO's old cell phone and gave him a new one.

34.     CISNEROS-RUBIO stated that, on February 15, 2008, at approximately 12:00 p.m., he called ACEDO, and ACEDO said that he was busy and would call CISNEROS-RUBIO was told by ACEDO that he was busy and that he would call him later.

9

35.    Following her arrest, AVILA was advised of and executed a written waiver of her *Miranda* rights. (These rights were advised to AVILA in Spanish.) During a subsequent interview, AVILA admitted that she had knowingly traveled to Chicago to oversee and engage in the above-described cocaine transaction.

FURTHER AFFIANT SAYETH NOT.


                                    _____
                                    Lamont Johnson, Special Agent
                                    Drug Enforcement Administration


Sworn and subscribed before me on this 16th day of February, 2008.

_____
MARIA VALDEZ
UNITED STATES MAGISTRATE JUDGE

10

**Find a Car:**
Make:
Model:

**Find by Category:**
Category:

- ▶ Home
- ▶ New Cars
- ▼ Used Cars
  - Used Car Listings
  - Trade-In Values
  - Compare
  - Reliability Ratings
  - Safety Ratings
  - Decision Guide
  - Sell Your Car
- ▶ Certified Pre-Owned
- ▶ CARFAX Reports
- ▶ Future Cars
- ▶ My Research
- ▶ My Car
- ▶ Finance
- ▶ Insurance
- ▶ Reviews & Articles
- ▶ Pictures & Videos

**Add to My MSN**
+ Add Auto News
+ Add Local Traffic

## Used Cars

# 1996 Dodge Ram 1500


Photo not available

View More Photos

Overview  **Prices**  Features & Specs  Photos  Reviews  Safety  Reliability

## Prices

### Focus Your Research

Filter the data below by trim.

Pick a Trim: | All Trims

What is a trim? Help me pick one.

**Kelley Blue Book Price**  $4,600 - $6,575
**Reliability**

**MSN Ratings**
Expert  Not Rated
User  **8.4**

Compare  |  Save this Car



| Do you know your credit score? |
|---|
| Excellent | 750-850 |
| Good | 660-749 |
| Fair | 620-659 |
| Poor | 350-619 |
| I Don't Know | ???? |

Find Out INSTANTLY!

advertisement

### General Prices  Pricing Definitions

| | **WS**<br>Reg.<br>Cab<br>6.5-ft.<br>Bed<br>2WD | **WS**<br>Reg.<br>Cab 8-<br>ft. Bed<br>2WD | **LT**<br>Reg.<br>Cab<br>6.5-ft.<br>Bed<br>2WD | **LT**<br>Reg.<br>Cab 8-<br>ft. Bed<br>2WD | **ST**<br>Club<br>Cab<br>6.5-ft.<br>Bed<br>2WD | **ST**<br>Club<br>Cab 8-<br>ft. Bed<br>2WD | **Reg.**<br>Cab<br>6.5-ft.<br>Bed<br>4WD | **Reg.**<br>Cab 8-<br>ft. Bed<br>4WD | **ST**<br>Club<br>Cab<br>6.5-ft.<br>Bed<br>4WD |
|---|---|---|---|---|---|---|---|---|---|
| **Regular Cab Trims** | | | | | | | | | |
| Kelley Blue Book Price | $4,825-<br>$5,375 | 4,600 -<br>$5,075 | $4,825-<br>$5,375 | 4,600 -<br>$5,075 | $5,875-<br>$6,575 | 5,625-<br>$6,575 | $4,825-<br>$5,375 | 4,600 -<br>$5,075 | 5,875 -<br>$6,575 |
| Original Retail Price (MSRP) | $13,741 | $14,013 | $15,106 | $15,390 | $18,051 | $18,332 | $18,492 | $18,832 | $20,519 |



GOVERNMENT EXHIBIT
Prelim 2
CARDELS  800-783-0399

1996 Dodge Ram 1500 - Prices - MSN Autos

Original Invoice Price | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N

MSN sponsors

## Model Warranty

The information shown below only applies to the original equipment manufacturer warranty.

| | |
|---|---|
| Basic (mo.) | No data |
| Basic (mi.) | No data |
| Powertrain (mo.) | No data |
| Powertrain (mi.) | No data |
| Rust (mo.) | No data |
| Rust (mi.) | No data |

advertisement

Page 2 of 3

2/21/2008

1996 Dodge Ram 1500 - Prices - MSN Autos

# Find the right car for you
Search from over 3 million new,
used & certified cars



msn autos Powered by AutoTrader

## Next Steps: 1996 Dodge Ram 1500

More Research

» Compare
» Find Kelley Blue Book values
» All model years
» Read related articles
» Read message boards

### Top Competitors

» Chevrolet C/K 1500
» Ford F-150
» GMC Sierra C/K 1500
» **Competitor Analysis**

Vehicles in your area

Enter your ZIP code:

There are **42009 Ram 1500
listings** nationally, **620** are
certified pre-owned.

See Listings

BB01 - 2/21/2006 11:52:02 AM

**OKLAHOMA DEPARTMENT OF PUBLIC SAFETY**
**CONTACT REPORT**                          **F5087913**

| ☒ WARNING NOTICE | ☐ FIELD INTERVIEW | ☐ PROGRAM | ☐ ASSIST |
|---|---|---|---|
| ☐ SHARE THE ROAD | ☐ ABANDONED VEH. | ☐ DEBRIS REMOVE | ☐ LIVESTOCK |

| DATE (MM-DD-YY) | 24 HR TIME | LOCATION |
|---|---|---|
| 2-12-08 | 1716 | MM 183 ½ |

| COUNTY | EAST LOCATION | NORTH LOCATION |
|---|---|---|
| STZ | | |

NAME (LAST, FIRST, MIDDLE)
JOSE EDUARDO CISNEROS RUBIO

ADDRESS                                   TELEPHONE
NUEVA ZAMBIA 44A

CITY                      STATE        ZIP
SONORA                   MEXICO

| BIRTHDATE (MM/DD/YY) | HGT | WGT | RACE | SEX | CLASS | ENDORSE |
|---|---|---|---|---|---|---|
| 10-15-85 | | | W | M | O | |

O.L.N -OR- S.S.N-OR-ID NUMBER              STATE
1260512150                                TEX

| VEHICLE MAKE | YEAR | STYLE | COLOR | TAG | STATE |
|---|---|---|---|---|---|
| FORD | 70 | W | GRY | 4T-76-575 | MEX |

| C.M.V. Y ☒N | PLACARD? Y ☒N | TRANSPORTING HAZ-MAT? Y ☒N |

OTHER VIOLATION / DEFECTIVE EQUIPMENT DESCRIPTION / FIELD INTERVIEW INFORMATION

| ☒ SPEEDING | ☐ NO LICENSE IN POSSESSION |
| ☐ DEFECTIVE VEHICLE | ☐ FAIL TO CARRY SECURITY VERIFICATION |
| ☐ UNSAFE LANE CHANGE | ☐ EXPIRED TAG |
| ☐ IMPROPER MOVEMENT | ☐ FOLLOWING TOO CLOSELY |

| TROOPER | BADGE | TROOP |
|---|---|---|
| PARK | 701 | R |

THIS IS NOT AN ARREST AND WILL NOT BECOME PART OF YOUR DRIVING RECORD.
This report documents that you were provided notice of a violation by a Trooper or that information pertinent to a vehicle/trailer in transit was obtained for official records.

X
SIGNATURE OF DRIVER

LIVESTOCK CONTACT-OR-SHARE THE ROAD INFORMATION
TRAILER I.D.
TRAVELING FROM - TO
OWNER/EMPLOYER
ADDRESS
CITY                  STATE        ZIP


GOVERNMENT EXHIBIT
PRELIM 3

# CERTIFICATE OF INSURANCE

NON-RESIDENT PERSONAL AUTO
NO COVERAGE PROVIDED IN MEXICO
NO AMPARA COBERTURA EN MEXICO

 **ALMEX**

Renewal of Number / Número de Renovación
This Certificate forms a part of
Master Policy Number ASA07-100001

Certificate: **ASA07    1072278**

**EMISION MEXICO**

**ITEM 1.** The declaration of information is the responsibility of the insured. Any omissions, incomplete or inexact declarations will terminate coverage and the obligations of the insurance company will be null and void.
Art. 1 La declaración de la información exacta, es responsabilidad del asegurado y cualquier omisión o declaración inexacta podrá originar la anulación de cobertura y con ello las obligaciones de la compañía aseguradora.

**NAME INSURED AND COMPLETE ADDRESS / NOMBRE Y DOMICILIO DEL ASEGURADO**

IGNACIO          LABORIN          CORDOVA
Call. NUEVA ZUMALIA 44 A          Col. NUEVO NOGALES
TELEPHONE/Télefonos (          ) NOGALES        SON        MEX

**IN CASE OF ACCIDENT
PLEASE REPORT TO:
EN CASO DE ACCIDENTE
FAVOR DE REPORTAR A**
U.S. WATS: 1-866-789-1785

**AMERICAN SERVICE
INSURANCE COMPANY, INC.**

**POLICY PERIOD / VIGENCIA: (          DAYS / DÍAS)**   12M

FROM /DESDE   2 / 11 / 2008   TIME/HORA 09:49 p.m.   ☐ A.M. ☒ P.M.
             MONTH/MES DAY/DIA YEAR/AÑO

TO /HASTA   2 / 11 / 2009   TIME/HORA 09:49 p.m.   ☐ A.M. ☒ P.M.
             MONTH/MES DAY/DIA YEAR/AÑO

**PRODUCER NUMBER
NUMERO DE AGENTE**

**80419**

**ITEM 2:    SCHEDULE OF COVERED AUTOS INSURED / ARTICULO 2 RELACION DE AUTOS AMPARADOS**

| Auto # | YEAR AÑO | TRADE NAME / MODEL MARCA / MODELO | MOTOR / SERIAL No. NUMERO DE SERIE / MOTOR | LICENSE PLATES & STATE OF ISSUE NUM. DE PLACAS Y EDO. DE EMISION |
|---|---|---|---|---|
| | 1996 | RAM 1500 | UT76595   SON | 1B7HF16ZUTJ199062 |

**ITEM 3** The insurance afforded by this certificate is solely with respect to coverages indicated below and where a specific premium charge is indicated. The limit of the coverages insurance company's liability against such coverages shall be as stated herein. Coverage is subject to all the terms, exclusions and conditions of the policy referenced by number on this certificate and will apply only to those autos designated in item 2 of this certificate.

Artículo 3 Las coberturas amparadas en este certificado de seguro, son específicamente las contratadas y descritas abajo. El límite máximo de responsabilidad civil que provee la compañía Aseguradora será el indicado en este certificado. Las coberturas amparadas por este certificado de seguro están sujetas a todas las cláusulas, exclusiones y condiciones de la póliza de seguro, cuya numeración arriba se indica y aplicará únicamente el vehículo descrito en el Artículo 2 de este mismo certificado.

**THIS STATEMENT SHOULD APPEAR IN RED. DO NOT ACCEPT OMISSIONS OR ALTERATIONS OF ANY KIND IN THE "SCHEDULE OF COVERED AUTOS", "LIMITS OF LIABILITY", OR PHOTOCOPIES OF THIS FORM. FOR VERIFICATION PLEASE CALL 1-866-789-1785**

| LIABILITY COVERAGES/COBERTURA DE RESPONSABILIDAD CIVIL | | LIMITS OF LIABILITY LIMITES DE RESPONSABILIDAD CIVIL | | PREMIUM PRIMAS |
|---|---|---|---|---|
| BODILY INJURY LESIONES CORPORALES A TERCEROS | $ | 20,000.00 | each person cada persona | $ |
| | $ | 40,000.00 | each accident por accidente | $ 100.00 |
| PROPERTY DAMAGE DAÑOS MATERIALES EN BIENES DE TERCEROS | $ | 15,000.00 | each accident por accidente | $ INCL |
| COMBINED BODILY INJURY AND PROPERTY DAMAGE COMBINACION DE DAÑOS MATERIALES Y LESIONES CORPORALES A TERCEROS | $ | XXXXXX | each accident COMBINED SINGLE LIMIT/LIMITE UNICO Y COMBINADO | $ XXX |
| MEDICAL PAYMENTS/GASTOS MEDICOS | $ 2,500.00 | each person cada persona | $10,000.00 each person por accidente | $ 10.00 |
| | | POLICY FEE/DERECHO DE POLIZA | | $ 10.00 |
| | | MISC. | | $ 0.00 |
| | | TOTAL | | $ 100.00 |

| | FULL NAME OF APPLICANT AND DRIVERS Nombre completo del titular y otros conductores | LICENSE NUMBER & STATE OF ISSUE Numero de Licencia y Estado de Emisión | AGE Edad | SEX Sexo | OCCUPATION Ocupación |
|---|---|---|---|---|---|
| APPLICANT TITULAR | JOSE EDUARDO CISNEROS RUBIO | 0RA0036219   SON | 21 | M | ESTUDIANTE |
| DRIVER #2 CONDUCTOR | MAYORES DE 21 AÑOS LIC. | | | | |
| DRIVER #3 CONDUCTOR | | | | | |
| DRIVER #4 CONDUCTOR | | | | | |

**GOVERNMENT EXHIBIT**
PRELIM 4
CARIBLES 800.765.0598

**IMPORTANT NOTICE:** A) ANY OMISSION IN THE DATES/TIMES OF THE "POLICY PERIOD" OR VEHICLE DESCRIPTION INFORMATION, IN THE "SCHEDULE OF COVERED AUTOS" COVERAGE AND THIS CERTIFICATE WILL BE NULL AND VOID, THE TOWING OF ANY PERSON LIVING IN THE UNITED STATES IS STRICTLY PROHIBITED AND WILL TERMINATE COVERAGE IN "SCHEDULE OF COVERED AUTOS". B) THIS CERTIFICATE DOES NOT PROVIDE COVERAGE FOR ANY "UNSCHEDULED AUTO" EVEN IF TOWED BY SCHEDULED AUTO.
B) THIS VEHICLE CAN BE DRIVEN ONLY BY ELIGIBLE AND AUTHORIZED PERSONS OVER 21 YEARS OLD AND UNDER 75 YEARS OLD WITH A VALID DRIVERS LICENSE

**NOTA IMPORTANTE:** LA OMISION EN LA FECHA/HORA DE INICIO O TERMINO DE VIGENCIA Y/O DATOS DEL VEHICULO ASEGURADO SON CAUSAS JUSTIFICABLES PARA LA ANULACION DE LA COBERTURA DE ESTE CERTIFICADO DE SEGURO. ESTA ESTRICTAMENTE PROHIBIDO REMOLCAR OTRO VEHICULO. SI INCURRE EN ESTO SE ANULARA LA COBERTURA DEL "VEHICULO ASEGURADO DESCRITO EN EL "ARTICULO 2 DE SECCION DE "RELACION DE AUTO AMPARADO". ESTE CERTIFICADO DE SEGURO NO PROVEERA COBERTURA A NINGUN "VEHICULO NO ESPECIFICADO E INSCRITO EN LA RELACION DE AUTO AMPARADO EN ESTA POLIZA. AUN SI ES REMOLCADO CON EL "VEHICULOASEGURADO"
B) ESTE VEHICULO PUEDE SER CONDUCIDO POR PERSONAS AUTORIZADAS Y ELEGIBLES MAYORES DE 21 AÑOS Y MENORES DE 75 AÑOS CON LICENCIA PARA CONDUCIR VALIDA Y VIGENTE.

**CONSENT FORM**
It has been explained to me that this policy is valid only for Mexican Residents or persons who reside full-time in Mexico. I further understand that any person living in the United States is not covered by this program. Furthermore, I agree that if it is determined that I am not a full-time resident of México, this insurance is not valid and does not provide any coverage to me in the United States. I hereby declare that I reside full-time in México and my vehicle(s) is/are principally garaged in the Republic of México.

**FORMA DE CONSENTIMIENTO**
Se me ha explicado que esta póliza de seguro es válida solamente para ciudadanos Mexicanos o personas que residen en México permanentemente. Más aun, estoy de acuerdo que si se determina que no soy un residente de tiempo completo en México, este seguro no es válido y no me proveerá ninguna cobertura en los Estados Unidos. Aquí mismo declaro que resido tiempo completo en México y que mi vehículo(s) tiene(n) su estancia principal en la República de México.

Firma X _José Eduardo_   Date/Fecha 11 / 02 / 2008   BY _____
          Signature                                                    AUTHORIZED REPRESENTATIVE



CARDELS 800-783-0202

GOVERNMENT
EXHIBIT
Prelim 5



CARDELS  800-763-0203

Prelim 6

GOVERNMENT
EXHIBIT

